UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN ADAMS, pro se )
*Plaintiff* )
)
v. ) Civil Action No.
)
COL. CHRISTOPHER S. MASON and )
MASSACHUSETTS STATE POLICE )
*Defendant*

## COMPLAINT

### JURISDICTION

1. This action arises under the Constitution and laws of the United States, Article III, Section I of the United States Constitution, the Second Amendment, and is brought pursuant to 42 U.S.C. § 1983.

2. This action also arises under the Constitution and laws of the Commonwealth of Massachusetts and is brought pursuant to M.G.L. c. 12 §11I, The Massachusetts Civil Rights Act.

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and § 1343.

4. This case is initiated in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which the Plaintiff resides and in which the Defendant maintains offices.

### PARTIES

5. Plaintiff John Adams is a citizen of the United States and a resides at 330 Church Street, Clinton, MA.

6. Defendant Colonel Christopher S. Mason is currently the Executive and Administrative Officer of the Massachusetts State Police, 470 Worcester Road, Framingham, MA 01702, and, as the leader of said organization, is the administrator in charge and is responsible for all decisions made by current and previous administrators. Col. Mason is being sued individually acting under the color of state law, to wit under color of the statutes, ordinances, regulations, policies, procedures, customs, and practices of the Commonwealth of Massachusetts and the Massachusetts State Police and as successor to Colonel Kerry Gilpin.

7. Defendant Massachusetts State Police, 470 Worcester Road, Framingham, MA 01702, is an agency of the Commonwealth of Massachusetts, under the Executive Office of Public Safety and Security.

## FACTS

8. On the morning of August 13, 2018, an article titled "State Police got many warnings on payroll abuse. And they did nothing" appeared in the Globe.

9. Later that same day, the Plaintiff received a call notifying him that he was being placed on administrative leave with pay and a Duty Status Hearing was scheduled for August 15, 2018.

10. On August 13, 2018, the Massachusetts State Police issued a news release informing the media and public that four, "additional Department members," had been identified to have, "discrepancies between overtime pay earned and actual hours worked";

11. The news release, mentioned above in paragraph 10, advised the media and public that the four additional Department members were relieved of duty "temporarily," and further that it "is scheduling internal hearings to determine what their duty status will be while internal and external investigations into their overtime shifts were conducted";

12. On August 13, 2018, following the news release by the Department, various news media published articles confirming the release;

13. The Plaintiff was employed as a Massachusetts State Police Trooper since June of 2000 and, at all times relevant, Plaintiff was assigned to the evening Community Action Team (CAT) as part of Troop E.

14. The evening CAT team was a created to be utilized by the Defendants where the CAT members were required to be highly flexible in their scheduling, were given minimal notice of each assignment, and could be called upon at any time.

15. The CAT team included assignments such as escorts and attendance at wakes and funerals, escorts for foreign and domestic dignitaries, escorts of high risk prisoners, response to large crowds and demonstrations, escort large equipment being transported, and patrol functions.

16. On August 14, 2018, a day before the Duty Status Hearing, the Plaintiff received a To/From authored by Captain James D. O'Leary, advising him that he was the subject of an Internal Affairs Investigation as a result of an audit of the former Troop E for the years 2015 and 2016.

17. Attached to Captain O'Leary's To/From was a To/From authored by Major Brian Watson, dated August 9, 2018, requesting a Personnel Investigation into the Plaintiff due

to the discovery of "irregularities" allegedly involving the Plaintiff during an overtime audit.

18. Within Major Watson's To/From, dated August 9, 2018, it stated in the last paragraph, "For your review, I have attached copies of Trooper Adams' Paystation entries and the applicable radio affiliation logs";

19. Other than the allegations found within Major Watson's To/From, no additional evidence was attached and the Plaintiff was provided no evidence or additional information to reasonably apprise him of the basis of these allegations.

20. Prior to his Duty Status Hearing, the Plaintiff was notified that his License to Carry a firearm had been suspended which was a premature suspension because the Duty Status Board is charged with making a recommendation regarding the license to carry following the hearing.

21. The Department of Criminal Justice Information Services (CJIS) for the Commonwealth of Massachusetts Executive Office of Public Safety and Security has confirmed that the License to Carry of Trooper Adams was suspended at 5:15 am on August 15, 2018, almost four (4) hours before the so-called "hearing," which was scheduled to take place at 10:00 am. that same day, and at which the Department claimed that the Duty Status of Trooper Adams would be "adjudicated";

22. The Plaintiff has filed a License to Carry Appeal which remains pending in Framingham District Court in the Commonwealth of Massachusetts.

23. There has never been any evidence presented that the Plaintiff is the subject of a criminal investigation.

**The Plaintiff's right to procedural and substantive due process was violated by the Duty Status Board appointed by Col. Gilpin.**

24. On August 15, 2018, a Duty Status Hearing was held, during which the Duty Status Board read the general allegations of overtime irregularities as contained in the August 9, 2018 memorandum authored by Major Watson;

25. The supporting documents that were referenced throughout Major Watson's memorandum, but were not attached to the memorandum, mentioned above in paragraph 18, were not presented to the Duty Status Board;

26. The Duty Status Board did not:
    a. Entertain any witness testimony;
    b. Review any evidence, including applicable CJIS history, pay station entries, and radio affiliation logs;
    c. Make any factual findings; and
    d. Inquire as to whether the Plaintiff was properly apprised of the allegations;

27. Lt. Col. Richard Warmington testified in a Civil Service Hearing involving another trooper with similar allegations that the Duty Status Board, whom Lt. Col. Warmington was a member and the chair, was provided with a grid prior to the hearing from then Col. Gilpin with relevant information that the Duty Status Board relied on in making their decisions on each of the troopers that day, but that grid mysteriously disappeared and has never been provided to the Plaintiff.

28. The Duty Status Board did not:
    a. Comply with M.G.L. c. 31 by providing at least three (3) days notice;
    b. Comply with M.G.L. c. 31by providing a copy of M.G.L. c. 31, §41-45 to the Plaintiff, as required;
    c. Provide a full hearing concerning the reasons for the contemplated suspension, as required by M.G.L. c. 31, §41, as well as an adequate opportunity to present a rebuttal
    d. Establish "just cause," as required by M.G.L. c. 31, §41; or
    e. Provide written notice of the Plaintiff's suspension without pay.

29. Nevertheless, despite the lack of evidence and the lack of opportunity for the Plaintiff to review evidence, the Plaintiff was suspended without pay at the recommendation of the Duty Status Board and given the fact that the Duty Status Board reviewed no evidence and made no factual findings with the premature suspension of the Plaintiff's license to carry, clearly shows that the decision to suspend the Plaintiff without pay was made before the Duty Status Hearing.

30. The Plaintiff was suspended without pay by Colonel Kerry Gilpin, predecessor of the Defendant, Christopher S. Mason.

31. The Plaintiff, in response to the order to suspend him without pay, filed two actions concurrently:
    a. An appeal of the Duty Status Hearing to the Civil Service Commission; and
    b. An internal review hearing pursuant to M.G.L. c 22 §43

**The CSC determined that the Duty Status Board violated the Plaintiff's due process rights by depriving the Plaintiff of a full just-cause hearing.**

32. The Plaintiff filed an appeal with the Civil Service Commission (herein "CSC") contending that he had been disciplined by the Defendants without a full just-cause Duty Status Hearing, and that he was aggrieved by the Defendants' decision to suspend him without pay.

33. The Defendants filed a Motion to Dismiss For Lack of Jurisdiction in the appeal to the CSC and after receiving briefs and holding a hearing on the Defendants' the CSC denied the Defendants' motion and the appeal was scheduled for a de novo just-cause hearing before the CSC.

34. The Defendants represented at the de novo hearing that it would not be presenting any evidence and that it was the Defendants' position that the CSC did not have jurisdiction or authority to issue any decision or power of enforcement regarding the Plaintiff's appeal.

35. During the de novo proceedings, the Defendants advised the CSC that the information and documents supporting the Plaintiff's suspension without pay was subject to ongoing investigations and prosecutions by the United States Attorney for District of Massachusetts and the Massachusetts Attorney General. Therefore, the Defendants did not provide copies of the information to the Plaintiff on the basis that it would interfere with or impede "important law enforcement functions".

36. The Plaintiff contended that it was the Defendants' burden to prove beyond a preponderance of the evidence, that it had just cause for its actions, and, as there was no evidence presented by the Defendants, therefore, the Plaintiff moved for a directed verdict.

37. The Plaintiff's oral Motion for Directed Verdict was taken under advisement by the Civil Service CSC and a decision in favor of the Plaintiff was rendered on March 28, 2019.

38. The issues before the CSC were: a) whether, prior to being suspended, Trooper Adams was provided with due process; and b) whether Trooper Adams had a right of appeal to the Commission.

39. After a review of the entire record and a reading of the relevant law, the CSC found that Trooper Adams had not been afforded due process, that he did have a right of appeal to the Commission, and that he was entitled to be reinstated to his position by the Massachusetts State Police.

40. The Defendants appealed the CSC's decision to the Superior Court of Massachusetts on the basis that the CSC lacked jurisdiction to hear an appeal of a Duty Status Hearing, but did not address the issue that the Plaintiff was deprived of his right to procedural and substantive due process.

**The Plaintiff's right to procedural and substantive due process was violated by the Section 43 Hearing Officer who was appointed by Col. Mason.**

41. In response to his suspension without pay, and concurrently with the first CSC hearing, the Plaintiff requested an internal review hearing pursuant to M.G.L. c 22 §43 ("Section 43 hearing").

42. In order to prepare for the internal Section 43 hearing, on September 21, 2018, the Plaintiff requested copies of information reportedly relied on in the course of the investigation including:
    a. of the radio Affiliation Logs upon which the Defendants relied on for each date;
    b. all CJIS queries entered by the Plaintiff for each day alleged;

    c. all RAMS entries made by the Plaintiff for each date for E-4, E-1, and E-2;
    d. all fuel records for the Plaintiff for each date;
    e. all transponder records for the Plaintiff for each date; and
    f. all pay station entries for the Plaintiff for each date.

43. Counsel for Trooper Adams was advised by the Department that the requested information purportedly supporting the decision to suspend Trooper Adams without pay was subject to an ongoing investigation and prosecution by the U.S. Attorney for the District of Massachusetts and the Massachusetts Court of Appeals, and therefore, the Department was unable to provide copies of the documents requested in the letter described in paragraph 42.

44. Trooper Adams' request for supporting documentation went unanswered until November 8, 2018, when he was allowed a few hours only to inspect the allegedly supporting reams of documents at the General Headquarters of the Massachusetts State Police in Framingham, MA.

45. Prior to the Plaintiff's Section 43 hearing, counsel for the Plaintiff requested that subpoenas be issued to witnesses who possessed information relevant to the decision to suspend the Plaintiff without pay, however, this request was summarily denied by Major DeBuccia who had been appointed as the Section 43 Hearing Officer by Col. Gilpin;

46. On August 29, 2019, over a year after a request for an internal review pursuant to M.G.L. c.22C, §43, the Section 43 hearing was held by Major DeBuccia and evidence was presented through testimony and a memorandum submitted by the Plaintiff, establishing that Colonel Kerry Gilpin's decision to suspend the Plaintiff without pay was arbitrary and capricious, prompted by derogatory news articles concerning an alleged lack of action on the part of the Department and was made without due process being afforded to the Plaintiff.

47. Following the Section 43 hearing, Major David DeBuccia authored a report dated December 4, 2019, recommending that the decision of the Duty Status Board to suspend the Plaintiff without pay be sustained and that his Section 43 appeal be denied.

48. The Section 43 "hearing" was simply another administrative formality directed by the Defendants to effectuate a pre-determined decision to suspend the Plaintiff without pay indefinitely just like the Duty Status "hearing".

49. Following the appeal hearing, on February 12, 2020, the Plaintiff received notice that the prior findings were upheld by the Defendants and the Plaintiff's Section 43 appeal was denied.

**The Plaintiff's right to procedural and substantive due process was violated by the Trial Board who was appointed by Col. Mason.**

50. The Defendant, Col. Mason, appointed a Trial Board consisting of three commissioned officers of his choosing, and said Trial Board scheduled a formal administrative hearing pursuant to the Defendant's Rules and Regulations, to hear the alleged violations referred to in Major Watson's To/From as described in paragraph 17.

51. The Defendants provided the Trial Board with evidence and testimony, generally, to show how they determined that the 46 investigated troopers had claimed overtime hours they had not worked and then, generally, stated that the review of the evidence against the Plaintiff supported that conclusion.

52. The Plaintiff had little if any evidence provided to him by the Defendants as he had requested prior to the Trial Board, but the Plaintiff provided testimony from colleagues who demonstrated the flexibility of overtime scheduling when it came to the Evening CAT Team's overtime assignments.

53. One Trial Board member inquired to a witness for the Defendants as to the flexibility of the Evening CAT Team and noted that the flexibility was not and could not be taken into account within the investigation of the Plaintiff's use and documentation of the overtime he worked.

54. The Trial Board decided against the Plaintiff with one of the three board members finding the Plaintiff not guilty of any wrongdoing.

55. In January 2020, the Defendants verbally offered the Plaintiff, as well as other troopers with similar charges, an agreement where the Plaintiff would be disciplined by forfeiting earned leave time, taking several more months of a status of suspension without pay, and provide an agreed upon amount of restitution.

56. In May 2020, the Plaintiff, accompanied by counsel and union representation, attended a meeting with the Defendants in Framingham, MA where, after good faith discussions had been had to come to specific terms as formerly described in paragraph 55, the Defendants inexplicably withdrew their offer while proceeding with agreements with all other troopers with similar charges.

**Plaintiff has appealed the violations of due process and the decision of the Trial Board to the Civil Service Commission.**

57. The Plaintiff appealed the Trial Board decision to the Civil Service Commission ("CSC") for a de novo hearing and CSC Chairman Christopher Bowman was assigned as the Hearing Officer.

58. Upon request by the Plaintiff, the Defendants provided discovery to the Plaintiff and the parties put forth thousands of pages of evidence that was referred to over the course of a ten day hearing, starting in December 2020 and ending in July 2021. Additionally, the Defendants have continually provided documents that the Plaintiff and Chairman

Bowman requested throughout the course of the hearing. Most of the discovery provided was not provided to the Plaintiff in the prior "hearings".

59. During the Civil Service Hearing Lieutenant Steven Hennigen testified that while investigating the Plaintiff in an unrelated matter he reviewed the overtime claims of the Plaintiff that are relevant to the time in question and Col. Gilpin declined to address Lt. Hennigen's concerns regarding whether the over time documented on Plaintiff's timecard was the overtime worked.

60. Additionally, Detective Lieutenant Joseph Ballou, testified that he was only permitted by his supervisors to look at the evidence described in paragraph 42 above and that he was instructed not to interview any of the Plaintiff's supervisors to determine if the Plaintiff had permission to work overtime shifts from home, permission to document overtime that had been worked at an odd time by writing down a generic claim either two hours before or two hours after a shift, and/or that he had worked overtime that he was not allowed to document and be compensated for.

61. The CAT Team had an unwritten practice that they received guaranteed overtime of 4 hours per week that was always to be documented on their time card as two hours before or after a shift. The CAT Team supervisors utilized this practice as a budgetary cost saving practice and utilized the CAT Team members at any time for any reason that the administration required. It was understood that time was part of the guaranteed four hours.

62. Also, testimony discovered a clear conflict in evidentiary collection and analysis during the course of the investigation against the Plaintiff because the relevant equipment and staff were the property of or employed by the Massachusetts Department of Transportation (herein "MassDOT") because MassDOT was the recipient and manager of the federal grant that funded the operations of the Troop E CAT Team.

63. MassDOT maintained and managed the Plaintiff's cruiser, cruiser radio, cruiser computer, and portable radio and MassDOT followed their own practices when it came to assigning and maintaining those items, and using replacement items.

64. During the Hearing witnesses testified that MassDOT frequently reassigned radios that were a primary part of the investigation to other MassDOT vehicles and, after the investigation was initiated, MassDOT audited the equipment and discovered there were radios assigned to troopers that were in MassDOT construction vehicles.

65. Testimony and evidence presented during the hearing demonstrated that the Plaintiff's supervisors were intentionally never interviewed during the course of the investigation, the Plaintiff was permitted to work some overtime from home, the documentation of overtime hours did not consistently reflect the actual hours worked, and the investigators were directed by superiors to only look at data points that supported the allegation that the Plaintiff did not work shifts he claimed to have worked on his time sheet.

66. The Defendants have admitted that they have lost thousands of emails from the time period of the investigation, including the emails by the Plaintiff, coworkers and supervisors, because the Defendants changed email servers and dumped the relevant time period of emails. The Plaintiff learned of the destruction of emails through the press publicizing a criminal case involving another trooper criminally charged for actions far in excess of those of the Plaintiff. (see *Commonwealth v. David Keefe*, Docket No. 1884CR00762)

67. The Defendants did not properly preserve the Plaintiff's assigned personal computer or the license plate reader that Plaintiff used every shift while at work and would likely have contained a record of use that the Plaintiff could have analyzed and provided valuable evidence as to the relevant dates.

68. The Defendants alleged that that the Plaintiff did not work six two hour shifts he claimed overtime for on his timesheet, but the Plaintiff has provided testimony and documentation in the CSC matter showing he was working those shifts.

69. The Defendants used an arbitrary guideline that only troopers who claimed, but did not work more than five overtime shifts would be suspended without pay.

70. Of the 46 troopers who were targeted for irregularities on their overtime shifts, the Defendants provided opportunities for approximately 17 troopers to retire, disciplined 28 additional troopers, many of whom were alleged to have worked more overtime shifts than the Plaintiff, wherein they forfeited vacation time, took lengthy periods of unpaid leave, and paid restitution. The Plaintiff was the only trooper terminated outright which was outrageous and disparate treatment in comparison to fellow troopers.

71. The Defendants' actions in indefinitely suspending the Plaintiff without pay and health benefits and ultimately terminating him was unduly unjust, arbitrary and capricious and most importantly, without substantive or procedural due process.

## COUNT I
## 42 U.S.C. § 1983 Claim
## DEPRIVATION OF DUE PROCESS
## IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS

72. The above paragraphs are incorporated by reference.

73. The Fifth Amendment of the United States Constitution states, in relevant part, "No person shall…be deprived of life, liberty, or property, without due process of law."

74. The Fourteenth Amendment of the United States Constitution states, in relevant part, "No State shall…deprive any person of life, liberty, or property, without due process of law."

75. 42 U.S.C. § 1983 provides: "Every person, who under color of law of any statute, ordinance, regulation, custom or usage of any state or territory or the District of

Columbia subjects or cause to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action of law, suit in equity or other appropriate proceeding for redress..."

76. The Plaintiff is a citizen of the United States.

77. Defendants Col. Christopher S. Mason and Massachusetts State Police is a person for purposes of 42 U.S.C. § 1983.

78. Defendants were at all times relevant hereto acting under color of state law.

79. The Plaintiff had the following clearly established rights at the time of the complaint conduct, detailed above:

   g. The right to due process rights in all disciplinary proceedings, as granted under the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983;

   h. The right of property interest in his employment, as granted under the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983; and

   i. The right to be free of deprivation to the Plaintiff's liberty interest in his job, as granted under the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983

80. Defendants knew or should have known of these rights at the time of the complained conduct detailed above, as they were clearly established at that time.

81. The United States Constitution is the sole determinant of due process protection; therefore, when a state grants an employee a substantive property right in his employment, it may not also authorize the deprivation of that interest without providing constitutionally sufficient procedural safeguards.

82. The acts and omissions of Defendants as described herein intentionally deprived the Plaintiff of his constitutional and statutory rights and caused him extensive damages.

83. As a direct and proximate result of the Defendants' unlawful conduct, the Plaintiff has been without pay and health benefits since August 15, 2018, entitling him to compensatory damages, in amounts to be determined at trial.

84. The Plaintiff will continue to suffer lost earning and impaired earning capacity and the value of his total and future damages shall be ascertained in trial.

85. The Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs allowable by federal law.

86. The Plaintiff seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to redress the Defendants' unduly unjust, arbitrary and capricious actions, as described above.

## COUNT II
## VIOLATION OF M.G.L. c.12, §11I
## THE MASSACHUSETTS CIVIL RIGHTS ACT

87. The above paragraphs are incorporated by reference.

88. The Defendants have a long standing past practice of permitting flexibility in the use and record of overtime by the Evening CAT Team of which the Plaintiff was a member during all relevant times.

89. The Defendant knew the Evening CAT Team was used by the Colonel and his designees for unscheduled and, sometimes, immediate situations to work overtime which allowed for an unwritten agreement that overtime documentation would not always reflect the actual time worked.

90. The Defendants' investigation into the overtime of the Plaintiff, as a member of the Evening CAT Team, was flawed where the Defendants had to expand the parameters to investigate the Troop E CAT Team from the parameters used for all other troopers investigated for irregularities in their overtime practices.

91. The Defendant's investigation was also flawed because the data points used, to determine that the Defendant had claimed overtime on his time card that was allegedly not actually worked, were engineered to only make findings of the alleged false claims and the Defendant did not consider other data points or evidence that demonstrate the Plaintiff's time worked was an acceptable practice.

92. The flawed investigation led to the termination of the Plaintiff.

93. The Defendant's own administrative process to investigate and discipline employees, including Plaintiff, were not complied with and deprived the Plaintiff of procedural and substantive due process rights to defend himself.

94. These actions with the extraordinary public nature of the investigation and termination of Plaintiff by Defendants utterly humiliated him and caused extreme anxiety and distress to the Plaintiff.

95. The Plaintiff's right to employment was substantially interfered with.

96. The acts and omissions of Defendants as described herein intentionally deprived the Plaintiff of his constitutional and statutory rights and caused him extensive damages.

97. As a direct and proximate result of the Defendants' unlawful conduct, the Plaintiff has been without pay and health benefits since August 15, 2018, entitling him to compensatory damages, in amounts to be determined at trial.

98. The Plaintiff will continue to suffer lost earning and impaired earning capacity and the value of his total and future damages shall be ascertained in trial.

99. As a result of the conduct of the Defendants, the Plaintiff's statutory rights have been violated and he has suffered a loss of benefits, reputation, and earning capacity. All such damages continue through this date.

## COUNT III
## SECOND AMENDMENT IN VIOLATION OF 42 U.S.C. §1983

100. The above paragraphs are incorporated by reference.

101. The Supreme Court has held that "the Second Amendment protects the right to keep and bear arms for the purpose of self-defense." *McDonald v. City of Chicago, Ill.*, 130 S.Ct. 3020, 3021 (2010).

102. Plaintiff cannot exercise this fundamental right because the Defendants suspended his license to carry and to possess a firearm prior to the Duty Status Hearing and prior to taking any disciplinary action against Plaintiff's employment.

103. Defendant has taken further action to revoke his license to carry or to possess a firearm which Plaintiff is pending an appeal before the District Court of the Commonwealth of Massachusetts.

104. Defendants' action to terminate Plaintiff is based on a flawed investigation and flawed conclusions which is the underlying reason for revoking the Plaintiff's license to carry and possess a firearm.

105. Defendants have arbitrarily permitted other employees, subjected to the same flawed investigation, who admitted similar or more egregious conduct to continue to have a license to carry and to possess a firearm.

106. Plaintiff contends that the action by the Defendants to suspend his license to carry and to possess a firearm and the subsequent revocation based on a flawed investigation has violated his Fundamental Rights and is depriving Plaintiff from owning or possessing a firearm.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests judgment against the Defendant in an amount to be determined by the jury for compensatory damages, including, but not limited to financial losses, immediate discomfort, emotional pain and suffering and emotional distress, humiliation and embarrassment, inconvenience, annoyance and alarm, medical expenses, lost wages, and lost earning potential and any other further relief this Honorable Court deems fair and just.

The Plaintiff further requests the reimbursement of costs and attorney's fees associated with this action and any such other and further relief as this Court deems just and proper.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS OF HIS COMPLAINT, WHERE ALLOWED BY LAW.

Respectfully submitted,

*John Adams*

John Adams, pro se
Plaintiff

DATED: 13 August 2021